### AFFIDAVIT OF SPECIAL AGENT PAUL THALHEIMER IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Paul Thalheimer, state:

#### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent with the U.S. Department of State, Diplomatic Security Service ("DSS"), and have been so employed since January 2009. I have successfully completed the Criminal Investigative Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia, the Reid Technique of Interviewing, and the Basic Special Agent training program with the DSS, including detailed training into the investigation of passport and visa fraud. I have a bachelor's degree from Randolph-Macon College in psychology and a master's degree from the University of Maryland in public policy. My current duties as a DSS Special Agent include conducting investigations involving the fraudulent acquisition, production, and misuse of U.S. immigration documents, U.S. passports, U.S. visas, and other identity documents. Due to my training, experience, and conversations with other law enforcement officers, I am familiar with the methods, routines, and practices of document counterfeiters, vendors, and persons who fraudulently obtain or assume false identities.

2.      I am currently investigating Fortune Aikorogie ("AIKOROGIE") for money laundering, in violation of 18 U.S.C. § 1956.

3.      I submit this affidavit in support of an application for a warrant under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize records and data from the e-mail account identified as sydneyfortune@aol.com ("the target account") (as described in Attachment A).

1

4.      I have probable cause to believe that this account contains evidence, fruits, and instrumentalities of the crime identified above, as described in Attachment B.

5.      Based on the email address's domain name, I have probable cause to believe that the account and relevant data are maintained by Oath Inc. ("Oath"), which, government databases indicate, accepts service of process at:

lawenforcement@teamaol.com

as described in Attachment A.

6.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

7.      On September 28, 2016, a man opened a checking account in the name of Tinashi Chipo at a TD Bank branch in Dracut, Massachusetts, using a Zimbabwean passport containing a U.S. visa, and a Zimbabwean driver's license. "Chipo" represented that he lived in Lowell, Massachusetts.

8.      On October 5, 2016, D.W. wired $10,000 from her bank account in Texas into the Chipo account. On October 6 she wired $2,000 into the Chipo account. On October 24, she wired $21,500 into the Chipo account. On November 1 she wired another $21,500 into the Chipo account.

9.      On December 15, 2016, E.W. wired $20,500 from her bank account in Texas into the Chipo account.

2

10.     Within less than three months after the Chipo account was opened, numerous large cash withdrawals from the account were made at various TD Bank branches located in the Boston area and north of the city: $9,300 on October 6 in Peabody; $1,280 on October 7 in Andover; $1,570 on October 11 in North Beverly; $2,300 on October 18 in Lawrence; $5,000 on October 25 in Peabody; $9,000 on October 26 in Waltham; $6,050 on October 26 in Burlington; $5,000 on November 2 at Faneuil Hall; $6,000 on November 2 at Massachusetts General Hospital; $5,700 on November 2 in Beverly; $3,350 on November 3 in Peabody; and $11,000 on December 16 in Tewksbury.

11.     A TD Bank fraud investigator became suspicious. On December 19, 2016, she called "Chipo" and asked about the activity in his account. "Chipo" said he was helping his uncle with his construction business, Murphy Construction. He claimed that the money that had been wired into the account was payment for a construction project. He said he withdrew cash from the account so that his uncle could buy materials and pay workers. The investigator told "Chipo" he would need to give TD Bank proof of his explanation, such as receipts for materials purchased for the construction business.

12.     The fraud investigator contacted E.W. She said she had wired money into the Chipo account at the direction of her online boyfriend, who identified himself as Christopher Hawley.

13.     The fraud investigator called "Chipo" and told him TD Bank was going to close his account. She told him that he needed to come to the bank in person to effect the closure. He said he would go to the Lawrence, MA branch. The fraud investigator notified Lawrence police.

14.     On December 21, 2016, when "Chipo" arrived at the TD Bank branch in

3

Lawrence, he was met by Lawrence Police Detective Kevin Schiavone and another officer.

"Chipo" presented the Zimbabwean passport (containing a U.S. visa) and driver's license that

had been used to open the checking account. Detective Schiavone confiscated the documents.

15.     After a *Miranda* reading, "Chipo" admitted that his true identity was

AIKOROGIE. With AIKOROGIE's permission, the officers entered his Toyota Camry and

found his wallet, which contained a Massachusetts driver's license bearing AIKOROGIE's name

and photograph.

16.     The next day, December 22, 2016, after signing a *Miranda* waiver, AIKOROGIE

was interviewed by Detective Schiavone and me. The interview was audio-recorded.

AIKOROGIE told us the following. He said he opened the Chipo account at the direction of a

man in Nigeria named Terry. Terry told AIKOROGIE that Terry's girlfriend would deposit

money into the account and then Terry wanted AIKOROGIE to withdraw it. It took Terry about

a year to convince AIKOROGIE to open the Chipo account. Terry wanted AIKOROGIE to use

AIKOROGIE's existing TD Bank account in his true identity. But AIKOROGIE did not want to

use his account in his own name because he did not want to "tarnish his image." AIKOROGIE

told Terry he would only use an account not in his true name. To get fake identification

documents, AIKOROGIE texted a photo of himself to Terry. Terry used the photo to create the

Chipo passport, visa, and license, which AIKOROGIE received by mail. AIKOROGIE admitted

those documents were counterfeit, and admitted using them to open the Chipo account.

AIKOROGIE said he did not know why people had wired money into the Chipo account. He

admitted, however, that the money was wired by persons he did not know; that he promptly

withdrew the funds in cash; that he withdrew the money in multiple smaller amounts and went to

different TD Bank branches to do so; that he accumulated the withdrawn cash and then delivered it in two lump sums, each time to a man he did not know (two different men); and that he did so at the direction of Terry, who was "running a scheme."

17.     At the end of the interview, Detective Schiavone arrested AIKOROGIE for identity fraud (and for unlawful wiretap, based on our discovery that AIKOROGIE had been secretly recording our interview on his cell phone) in violation of Massachusetts state law.

18.     Detective Schiavone contacted victim D.W., who said she had wired money into the Chipo account at the direction of her online boyfriend, who identified himself as Morris Crystal.

19.     A state search warrant for AIKOROGIE's Toyota Camry was executed on December 23, 2016. One document found in the Camry was a TD Bank document for an account opened in March 2016 in the name of Adrian Jayden.

20.     The TD Bank fraud investigator determined that a phone number which had been used to access the Chipo account online also had been used for online access to the Adrian Jayden account, as well as accounts opened in February and May 2016 in the names of Amadou Diallo and Murphy Cameron. Bank surveillance photos of a person withdrawing cash from those three accounts at various TD Bank branches appear to depict that Amadou Diallo, Adrian Jayden, and Murphy Cameron are all AIKOROGIE.

21.     The Amadou Diallo, Adrian Jayden, and Murphy Cameron accounts received wire transfers totaling $113,100 from five individuals: S.S., H.T.N., E.W., J.F., and J.C. One of them, S.S., wired money to both the Adrian Jayden and the Murphy Cameron accounts. She told agents that she did so at the direction of her online boyfriend, who used the name Willie E.

5

Johnson. Another of the individuals, H.T.N., wired money to the Adrian Jayden account. She told agents that she did so at the direction of her online boyfriend, who used the name Ken Rolando.

22.     On March 7, 2019, a grand jury sitting in Boston indicted AIKOROGIE on one count of False Statement to a Bank, in violation of 18 U.S.C. § 1014; five counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and one count of Passport and Visa Fraud, in violation of 18 U.S.C. § 982(a)(2)(A). *United States v. Fortune Aikorogie, a/k/a Imuetinyan Aikorogie, a/k/a Fortune Aikoriogie, a/k/a Imuetinyan Aikoriogie*, Crim. No. 19-10085-RWZ.

### PROBABLE CAUSE TO BELIEVE THAT THE ACCOUNT CONTAINS EVIDENCE, FRUITS, AND INSTRUMENTALITIES

23.     I have probable cause to believe that the target account contains evidence, fruits, and instrumentalities of a money laundering scheme in which AIKOROGIE was a participant.

24.     When Detective Schiavone and I interviewed him on December 22, 2016, AIKOROGIE said that he told Terry about the TD Bank fraud investigator's request for proof that funds wired into the Chipo account were used for a construction business. According to AIKOROGIE, Terry responded by promising that "a friend" would email AIKOROGIE a receipt he could use. AIKOROGIE indicated during the interview that he had received the email.

25.     I have probable cause to believe that AIKOROGIE's email account is the target account, based on the following information:

      a.     AIKOROGIE told Detective Schiavone and me that, in addition to his regular employment, he buys cars advertised on Craigslist and sells them to people in Nigeria. AIKOROGIE is a naturalized U.S. citizen originally from Nigeria.

6

b.     Among the papers found in AIKOROGIE's Camry when it was searched in December 2016 was a document relating to the shipment of a car to a consignee in Nigeria. The shipper was identified as V & R Export, whose contact person was identified as AIKOROGIE. The target account was listed as AIKOROGIE's email address.

c.     Another document found in the Camry was a printout of an email dated February 11, 2016, to the target account containing instructions for transferring money from an account in Nigeria to a Citibank account in New York.

26.     I have probable cause to believe that the target account was used in furtherance of a money laundering scheme in which AIKOROGIE participated starting shortly before he opened the Chipo account on September 28, 2016, and ending on or about December 22, 2016, when he was arrested on state charges.

27.     On February 15, 2019, Assistant U.S. Attorney Christine Wichers sent Oath a letter requesting under 18 U.S.C. § 2703(f) that the company preserve records associated with the target account for 90 days.

### *TECHNICAL BACKGROUND*

28.     On information and belief, Oath Inc. allows customers to store opened incoming mail and sent email indefinitely if they choose, subject to a maximum size limit.

29.     Email providers also typically maintain electronic records relating to their customers. These records include account application information, account access information, and email transaction information.

7

### *LEGAL AUTHORITY*

30.     The government may obtain both electronic communications from an email provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

31.     Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or email provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

32.     If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

33.     This application seeks a warrant to search all responsive records and information under the control of Oath, a provider subject to the jurisdiction of this court, regardless of where Oath has chosen to store such information. Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications if such communication is within Oath's possession, custody, or control, regardless of whether such communication is stored, held, or maintained outside the United States.

### *FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT*

34.     Federal Rule of Criminal Procedure 41(e)(2)(A)-(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of Oath,

8

as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data. This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

### CONCLUSION

35.    Based on the information described above, I have probable cause to believe that emails from the target account (as described in Attachment A), contain evidence, fruits, and instrumentalities of the above-listed crime (as described in Attachment B).

36.    The procedures for copying and reviewing the relevant records are set out in Attachment B to the search warrant.

Respectfully submitted,

PAUL THALHEIMER
Special Agent
Diplomatic Security Service, U.S. Department of State

Subscribed and sworn to before me
on April 19, 2019

MARIANNE B. BOWLER
United States Magistrate Judge

9

## ATTACHMENT A

The premises to be searched and seized are the email account identified as

sydneyfortune@aol.com ("the target account"). This information is maintained by Oath Inc.

("Oath"), which accepts service of process at: lawenforcement@teamaol.com

**ATTACHMENT B**

I.   **Search Procedure**

A.   Within fourteen days of the search warrant's issue, the warrant will be served on Oath, which will identify the accounts and files to be searched, as described in Section II below.

B.   Oath will then create an exact electronic duplicate of this account and files ("the account duplicate").

C.   Oath will provide the account duplicate to law enforcement personnel.

D.   Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

II.   **Accounts and Files to Be Copied by Oath Personnel**

A.   All email associated with the target account, whether draft, deleted, sent, or received, dated between September 1, 2016, and December 22, 2016, within the possession, custody, or control of the Company, "regardless of whether such communication, record, or other information is located within or outside of the United States," *see* 18 U.S.C. § 2713.

III.   **Records and Data to be Searched and Seized by Law Enforcement Personnel**

A.   Evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1956, including:

1.   All communications to, from, or concerning Terry;

2.   All communications concerning Tinashi Chipo, Adrian Jayden, Amadou Diallo, or Murphy Cameron;

3.      All communications concerning TD Bank; bank accounts; or depositing, wiring, withdrawing, or transferring money;

3.      All communications to, from, or concerning D.W., E.W., S.S., H.T.N., E.W., J.F., or J.C.;

4.      All communications about directing or persuading individuals to send money to a bank account or person based on false representations, including but not limited to false representations pertaining to romance; and

5.      The existence and identity of any co-conspirators.

3